# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DeShawn Collins (B-71295), | ) |
| Plaintiff, | ) |
| | ) Case No. 14 C 9639 |
| v. | ) |
| | ) Judge John J. Tharp, Jr. |
| Dr. Jonathan Kelly, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff DeShawn Collins, who is proceeding *pro se*, contends that Stateville Correctional Center psychiatrist Jonathan Kelly's decision to discontinue a psychiatric prescription medication for approximately one month violated his Eighth Amendment right to receive constitutionally adequate medical care. Dr. Kelly's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is before the Court. The record reflects that Dr. Kelly provided attentive and professionally reasonable care for Collins at all times, so the Court grants Dr. Kelly's motion in its entirety.

## BACKGROUND

### I. Northern District of Illinois Local Rule 56.1

Local Rule 56.1 sets out a procedure for presenting facts that are germane to a party's request for summary judgment pursuant to Fed. R. Civ. P. 56. Specifically, Local Rule 56.1(a)(3) requires the moving party to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). Each paragraph of the movant's statement of facts must include "specific references to the affidavits, parts of the

record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a). The opposing party must file a response to each numbered paragraph in the moving party's statement, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(C). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(C). "[I]f additional material facts are submitted by the opposing party . . . , the moving party may submit a concise reply in the form prescribed in that section for a response." L.R. 56.1(a).

Because Collins is proceeding *pro se*, Dr. Kelly served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" as required by Northern District of Illinois Local Rule 56.2. The notice explained how to respond to Dr. Kelly's summary judgment motion and Local Rule 56.1 statement of facts and cautioned Collins that the Court would deem Dr. Kelly's factual contentions admitted if Collins failed to follow the procedures in Local Rule 56.1.

Although courts construe *pro se* pleadings liberally, *see Thomas v. Williams*, 822 F.3d 378, 385 (7th Cir. 2016), a plaintiff's *pro se* status does not excuse him from complying with federal and local procedural rules. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) (holding that "we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel"); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("even *pro se* litigants must follow procedural rules"). Collins

did not submit any filings in opposition to Dr. Kelly's motion for summary judgment and the time to do so has passed. Because Collins has neither responded to Dr. Kelly's statement of facts nor opposed the summary judgment motion, the Court will accept Dr. Kelly's "uncontroverted version of the facts to the extent that it is supported by evidence in the record." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012); L.R. 56.1(b)(3)(C).

**II. Facts**

Collins is currently incarcerated at the Hill Correctional Center, but was housed at the Stateville Correctional Center in 2013, when he received the medical care at issue in this lawsuit. (Def. SOF at ¶ 1.) Dr. Kelly is a psychiatrist who has treated psychiatric disorders at Stateville since January 6, 2011. (*Id.* at ¶¶ 2, 6.) Dr. Kelly is trained in the pharmacologic management of mental disorders through the use of psychotropic medications. (*Id.* at ¶ 6.) In determining which psychotropic medicine to prescribe for a mental health disorder, Dr. Kelly utilizes his professional judgment to prescribe the most efficacious medication at the lowest possible dose to obtain the desired therapeutic outcome, while minimizing the risk of adverse side effects. (*Id.* at ¶ 9.) His practice is to inform patients of the benefits of specific medications, as well as any potential side effects. (*Id.* at ¶ 10.)

Dr. Kelly first treated Collins at Stateville on May 14, 2013. (*Id.* at ¶ 8.) At that time, he diagnosed Collins with an unspecified mood disorder. (*Id.*; Pl. Dep. at 11:20-12-5.) Based on this diagnosis, Dr. Kelly decided to prescribe Depakote (Valproic Acid) at a dosage of 500 mg twice daily. (Def. SOF at ¶ 12.) Possible side effects of Depakote include infection, a decrease in blood platelets and the ability to clot, a decrease in white blood cells, acute liver failure, and other complications. (*Id.* at ¶ 14.) Because Collins had a history of leukopenia (abnormally low white blood cells) dating back to 2001, and leukopenia can affect the body's ability to fight infection,

Dr. Kelly ordered blood tests during the May 14, 2013 appointment so he could monitor whether Depakote therapy caused any adverse effects. (*Id*. at ¶¶ 15, 18.)

On May 29, 2013, Collins' blood was drawn. (*Id*. at ¶ 16.) Test results obtained the following day showed that his white blood cells, percent neutrophils (the percentage of a type of white blood cell), and platelets were low, and his valproic acid level and percent lymphocytes (the percentage of another type of white blood cell) were high. (*Id*. at ¶ 17.) On June 4, 2013, Dr. Kelly reviewed the test results with Stateville Medical Director Saleh Obaisi, MD, because he was concerned about Collins' valproic acid level, neutrophils, and platelet count. (*Id*. at ¶ 19.) Dr. Kelly compared Collins' prior test results, which showed that he had leukopenia in 2001 and 2011, with the May 2013 test results, and concluded that Depakote therapy could be adversely affecting Collins' blood cells. (*Id*. at ¶¶ 19-20.)

If Collins' leukopenia worsened, he would have a greater risk of infection and a decreased ability to fight infection, and patients with significant leukopenia who contract an infection can experience complications such as sepsis, septic shock, and death. (*Id*. at ¶ 22.) Decreased platelets can result in the inability to clot blood in the event of a cut or laceration. (*Id*.) Infection and physical injuries accompanied by bleeding are of particular concern in the prison context. (*Id*.)

Accordingly, Dr. Kelly balanced the benefits versus the risks of continuing Depakote and decided to discontinue Depakote and re-evaluate Collins to determine if Depakote was responsible for Collins' abnormal bloodwork. (*Id*. at ¶ 21.) Based upon his review of Collins' medical records at Stateville, Dr. Kelly believes that discontinuing Depakote on June 4, 2013, did not result in any physical harm to Collins. (*Id*. at ¶ 49.) Dr. Kelly's sole reason for

discontinuing Depakote was to prevent it from negatively affecting Collins' chronic leukopenia. (*Id*. at ¶¶ 50, 54.)

On June 21, 2013, Collins' blood was redrawn pursuant to Dr. Kelly's orders to determine if Collins' condition had improved after discontinuing Depakote. (*Id*. at ¶ 23.) It had not. (*Id*.) For unknown reasons, Collins did not present for a July 3, 2013 appointment with Dr. Kelly, who had planned to review Collins' lab results and medication options with him at this time. (*Id*. at ¶ 24.) Thus, Collins was rescheduled to follow-up in one week. (*Id*.)

Collins presented for his appointment with Dr. Kelly on July 9, 2013. (*Id*. at ¶ 25.) Dr. Kelly told Collins that his white blood cell count had been low since 2001. (*Id*.) Dr. Kelly also stated that he had discontinued Depakote on June 4, 2013, due to his concerns about Collins' decreased white blood cell count and platelets and increased valproic acid levels. (*Id*.) Collins informed Dr. Kelly that he had not had any recurrent infections, bruising, or bleeding, that he believed that Depakote was helping him, and that he wanted to resume taking it. (*Id*.) Dr. Kelly weighed the therapeutic benefit from Depakote, Collins' desire to resume Depakote, the absence of clinical side effects (other than Collins' questionable bloodwork), and Collins' lab test results, and decided that Collins could safely resume treatment with Depakote. (*Id*. at ¶ 26.) Dr. Kelly, however, asked Collins to notify the health care unit if he developed any side effects or had any symptoms of physical illness, infection, or bleeding. (*Id*. at ¶ 25.) Dr. Kelly also told Collins that he might have to stop Depakote if his platelet counts decreased excessively or he had other significant side effects. (*Id*.)

Collins immediately resumed therapy with Depakote, and Dr. Kelly ordered additional bloodwork to monitor any adverse effects. (*Id*. at ¶ 27.) On July 12, 2013, Collins' blood was drawn. (*Id*. at ¶ 28.) His white cells evidenced continued leukopenia, his platelets were normal,

and his neutrophils and percent neutrophils were low. (*Id*.) Bloodwork drawn on July 24, 2013, again was abnormal. (*Id*. at ¶ 29.) Dr. Kelly re-evaluated Collins on July 30, 2013, and discussed his lab results with him. (*Id*.) Collins told Dr. Kelly that he wanted to continue taking Depakote despite his chronically low white blood cell levels, as he felt that it was helping him and he was not exhibiting any signs of infection. (*Id*.) Thus, Dr. Kelly renewed the Depakote prescription, ordered more bloodwork, and scheduled a follow-up appointment. (*Id*.) Later that year, Dr. Kelly continued to monitor Collins' blood and renewed the Depakote prescription. (*Id*. at ¶¶ 31-32.)

At Collins' medication review visit on January 14, 2014, Dr. Kelly changed Collins' diagnosis from unspecified mood disorder to bipolar disorder. (*Id*. at ¶ 33.) Dr. Kelly continued Depakote and ordered more bloodwork. (*Id*.) Test results from January, April, September, October, and December 2014, as well as January, February, May, and July 2015, continued to show the same abnormal but stable values for white blood cells, platelets, neutrophils, and lymphocytes. (*Id*. at ¶¶ 34-35.) Dr. Kelly saw Collins on March 4, 2013. (*Id*. at ¶ 36.) On May 12, 2014, Dr. Kelly's request for a hematology consult at the University of Illinois Medical Center to determine the cause of Collins' chronic leukopenia was approved. (*Id*. at ¶¶ 37, 64.)

On June 10, 2014, Collins had another appointment with Dr. Kelly. (*Id*. at 36.) Dr. Kelly reviewed Collins' test results and discussed his chronic leukopenia, and decreased platelet count. (*Id*. at ¶ 38.) Collins acknowledged that Depakote could be negatively affecting his white blood cell count but told Dr. Kelly that he was willing to wait for the hematologist's recommendation before deciding to stop it. (*Id*.). On November 19, 2014, Collins requested an increased dose of Depakote to control symptoms of his bipolar disorder, so his Depakote dose was increased from 1000 mg daily to 1500 mg daily. (*Id*. at ¶ 39.)

Collins saw a UIC hemotologist on November 22 and December 18, 2014. (*Id*. at ¶ 40.) In the meantime, on December 10, 2014, Stateville staff advised Dr. Kelly that Collins' neutrophil count was low. (*Id*.) Because it remained unclear if Depakote was responsible for Collins' abnormal lab results and the hematologist had not yet provided a report, Dr. Kelly discontinued Depakote on December 10, 2014, pending receipt of the report. (*Id*. at ¶ 40.) Ultimately, the hemotologist diagnosed Collins with benign ethnic neutropenia (a genetic variation in persons of African descent, which is not accompanied by an increased susceptibility to infection). (*Id*. at ¶ 41.)

Dr. Kelly saw Collins again on January 7, 2015. (*Id*. at ¶ 42.) Dr. Kelly's notes indicate that Collins' white blood cell count had been low since 1995 and that the UIC hematologist recommended bloodwork every six months to monitor Collins' white blood cell counts. (*Id*.) Collins decided not to resume Depakote at this time. (*Id*.) On January 28, 2015, however, Collins had another appointment with Dr. Kelly and expressed a desire to restart Depakote, so Dr. Kelly prescribed Depakote at a dose of 500 mg twice daily (*Id*. at ¶ 43.) During a clinical visit on March 25, 2015, Collins' prescription for Depakote, 500 mg twice daily, was continued. (*Id*. at ¶ 44.) On June 23, 2015, Dr. Kelly charted that Collins had informed Nurse Wendy Dybas that he asked to resume Depakote on January 28, 2015 because "it helps my case." (*Id*. at ¶ 45.)

During each appointment with Collins, Dr. Kelly explained his concerns about Collins' chronic leukopenia and reminded him that Depakote could potentially have an adverse effect on his blood cells that could endanger his health. (*Id*. at ¶ 46.) Dr. Kelly also answered Collins' questions. (*Id*.) When making decisions regarding Collins' medication, Dr. Kelly has balanced the therapeutic benefit against side effects, including a negative impact on Collins' blood cells. (*Id*. at ¶ 47.)

Collins' sole claim in this lawsuit is that from June 4, 2013, until July 9, 2013, he did not receive Depakote, and he was not immediately informed why Dr. Kelly had stopped his medication. (*Id.* at ¶¶ 57-58.) During his deposition, Collins testified that when he saw Dr. Kelly, Dr. Kelly told him that he had discontinued Depakote therapy because laboratory tests showed that the "medication was affecting [Collins'] low white blood cells" so Dr. Kelly "wanted to see what was going on with [Collins'] body." (Pl. Dep. at 24:9-16.) Collins also agreed that Dr. Kelly stated that having an inadequate or decreased amount of white blood cells may leave the body open to infection. (*Id.* at ¶ 62.) Collins did not know that he had a low white blood cell count until Dr. Kelly told him about it. (*Id.* at ¶ 63.)

At his deposition, Collins testified that he "could not dispute" that Dr. Kelly discontinued Depakote therapy because Dr. Kelly's impression was that it was dangerously lowering Collins' white blood cell count. (*Id.* at ¶ 66; Pl's Dep. at 41:3-21.) Nevertheless, he took issue with what he characterized as the "39 to 40 days" when he was "ignored" while "trying to find out what was going on." (Pl's Dep. at 41:3-21.) During this period, Collins experienced anxiety, mood swings, and depression, but did not suffer any physical injuries. (*Id.* at ¶¶ 67, 69.)

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 951 (7th Cir. 2013). In deciding a motion for summary judgment, the court "review[s] the evidence in the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences

8

in its favor." *NES Rental Holdings, Inc. v. Steine Cold Storage, Inc.*, 714 F.3d 449, 452 (7th Cir. 2013); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The party opposing the motion for summary judgment "gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011). However, the opposing party cannot rely on mere conclusions and allegations to create factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Nor can speculation be used "to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)). A court will grant summary judgment "if no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (internal quotation marks omitted); *see also Northbound Group, Inc. v. Norvax, Inc.*, 5 F. Supp. 3d 956, 966-67 (N.D. Ill. 2013).

**ANALYSIS**

The Court allowed Collins to proceed on a deliberate indifference claim against Dr. Kelly. (Dkt. 5.) "A prison official may be found in violation of an inmate's Eighth Amendment right to be free from cruel and unusual punishment if she acts (or fails to act) with 'deliberate indifference to [the inmate's] serious medical needs.'" *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc). Deliberate indifference claims contain both an objective and a subjective component: the inmate must have an objectively serious medical condition and the defendant must be subjectively aware of and consciously disregard the inmate's serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

9

The Court's consideration of Dr. Kelly's motion for summary judgment begins and ends with the subjective element because no evidence supports an inference that Dr. Kelly was deliberately indifferent. "Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (internal citations omitted). Instead, deliberate indifference is comparable to criminal recklessness. *Farmer*, 511 U.S. at 837. Neither medical malpractice nor a mere disagreement with a doctor's medical judgment constitute deliberate indifference. *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

Here, in the course of providing mental health treatment, Dr. Kelly diagnosed Collins with chronic leukopenia and mental health disorders. Dr. Kelly decided to prescribe Depakote to treat Collins' mental health issues, ordered bloodwork to monitor any impact Depakote might have, consulted with Stateville's Medical Director shortly after receiving Collins' first lab results following the administration of Depakote, and compared the new bloodwork with prior results. During Collins' next appointment, Dr. Kelly advised Collins of his concerns about a decrease in Collins' ability to fight infections and clot in the event of an injury. Dr. Kelly continued to monitor Collins' leukopenia and make decisions about Collins' psychotropic medication in consultation with Collins, and eventually ordered a hematology consult to obtain a specialist's diagnosis and recommendations after Collins' condition did not improve.

"The receipt of some medical care does not automatically defeat a claim of deliberate indifference," which still lies if a "prison official, having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th

Cir. 2015) (internal quotations and citations omitted). Nevertheless, an inmate's "disagreement with a provider's medical judgment is not enough to prove deliberate indifference." *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010).

The Court will focus on the period beginning June 4, 2013, and ending July 9, 2013, as Collins' deliberate indifference claim is based on his contention that during this period, he did not know why he was not receiving Depakote therapy. Collins asserts that after he stopped taking Depakote, he experienced anxiety, mood swings, and depression that—in his view at the time—were unnecessary. It is undisputed that when Collins met with Dr. Kelly on July 9, 2013, he learned that Dr. Kelly had discontinued Depakote on June 3, 2013, because it appeared to be dangerously lowering his white blood cell count and, in Dr. Kelly's judgment, the risks of continued Depakote therapy outweighed its clinical benefits.

Collins' Eighth Amendment claim turns on whether Dr. Kelly was deliberately indifferent to a serious medical need, not the alacrity of efforts made to apprise Collins about the rationale underlying the decision to discontinue Depakote therapy or whether Collins (incorrectly, as things turned out) felt he was being ignored. *See Budd v. Motley*, 711 F.3d 840, 844 (7th Cir. 2013) (affirming dismissal of deliberate indifference claim when the inmate was dissatisfied with treatment but "received medical attention, medication, testing, and ongoing observation"). While Collins experienced a modest delay in receiving an explanation about his treatment, Dr. Kelly unquestionably made a prompt medical judgment, in consultation with Dr. Obaisi, about the safety of continued Depakote therapy versus benefits given then-known information. The 35-day delay in meeting with Dr. Kelly (which would have been 29 days if Collins had presented for his July 3, 2013 appointment) is consistent with the realities of scheduling doctor's appointments, both in the correctional context and for private citizens. *See*

*Petties*, 836 F.3d at 730 (noting that "delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment.").

Moreover, Collins' criticism of the delay in advising him of the rationale supporting the discontinuation of Depakote therapy is insufficient, as a matter of law, to demonstrate deliberate indifference as Dr. Kelly's treatment decisions easily exceed the constitutional floor of "adequate, minimum-level care." *Petties*, 836 F.3d at 730. While "it can be challenging to draw a line between an acceptable difference of opinion (especially because even admitted medical malpractice does not automatically give rise to a constitutional violation), and an action that reflects sub-minimal competence and crosses the threshold into deliberate indifference," this is not such a case given Dr. Kelly's demonstrated attention to Collins' chronic leukopenia and the dangers associated with untreated, severe leukopenia. *See id.*; *see also Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) (even assuming that a lowered white blood cell count caused by a religiously motivated vegan diet is a serious medical need, defendant jail officials were entitled to summary judgment because undisputed evidence showed that they "acknowledged that [the inmate's] diet was inadequate and took steps to fix it. Their reasonable response to the problem precludes a successful showing of deliberate indifference."); *Gomez v. United States*, No. 13-CV-946-JPG-SCW, 2016 WL 5334788, at *2 (S.D. Ill. Sept. 23, 2016) (defendants who decided to discontinue prescription pain medication exercised "medical judgment within the scope of reasonable professional judgment" were not deliberately indifferent because they then "searched for the cause of [the plaintiff's] pain that was consistent with objective tests and for a medication that would be effective based on the various potential causes").

Accordingly, Dr. Kelly's motion for summary judgment is granted. If Collins wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If he appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, Collins could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. *Id.* If Collins seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

## CONCLUSION

For the above reasons, Dr. Kelly's motion for summary judgment [51] is granted. Final judgment will be entered accordingly.

John J. Tharp, Jr.  
United States District Judge

Dated: April 25, 2017